UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | C.A. No.: 18-2150 |
| AKORN, INC., TIMOTHY DICK, AND DAVID HEBEDA | |
| Defendants. | |

**COMPLAINT**

Plaintiff U.S. Securities and Exchange Commission (the "Commission") alleges as follows:

**NATURE OF THE ACTION**

1.      This is a case of financial reporting, books and records, and internal accounting controls violations by Akorn, Inc. ("Akorn"). In May 2016, Akorn restated its financial statements for fiscal year 2014. Its restatement, among other things, acknowledged material weaknesses in its internal control over financial reporting ("ICFR") and disclosed that previously reported net revenue for 2014 was overstated by approximately 7 percent and previously reported income from continuing operations before income taxes for 2014 was overstated by approximately 136 percent. Akorn's inaccurate 2014 financial statements resulted from various errors in Akorn's accrual of rebates and other contractual allowances using a process known as "gross-to-net" revenue accounting as well as its recognition of $2.9 million in revenue for a portion of a transaction with one of its wholesaler customers despite a lack of a basis on which to properly recognize such revenue in accordance with generally accepted accounting principles ("GAAP").

1

2.    In its 2013 Form 10-K, filed on March 14, 2014, Akorn disclosed that it did not have sufficient controls designed to validate the completeness and accuracy of underlying data used in the determination of significant estimates and accounting transactions, and that, as a result, errors were identified in the underlying data used to support significant estimates and accounting transactions, primarily relating to gross-to-net revenue adjustments, inventory reserves and the determination of useful lives of acquired intangible assets. Akorn further disclosed that it did not have an adequate process in place to support the accurate and timely reporting of its financial results and disclosures in its Form 10-K. Akorn had previously disclosed in its 2012 Form 10-K, filed on March 1, 2013, that it did not maintain sufficient effective controls to provide reasonable assurance that accounts were complete and accurate and agreed to detailed support. The risks associated with these unremediated material weaknesses became magnified during 2014 as a result of Akorn's decisions to undertake significant acquisitions, as well as changes to the nature of Akorn's business.

3.    Timothy Dick ("Dick"), as Chief Financial Officer ("CFO") at Akorn, and David Hebeda ("Hebeda"), as Controller at Akorn, had supervisory responsibilities for Akorn's internal accounting controls, gross-to-net revenue accounting and revenue recognition, and exercised control over these company functions.

**JURISDICTION AND VENUE**

4.    The Commission brings this action pursuant to the authority conferred by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

5.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1331.

6.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Acts, practices and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Northern District of Illinois. Moreover, all Defendants reside in this district.

7.      Defendants, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the acts, practices, and courses of business alleged herein.

**DEFENDANTS**

8.      Akorn, Inc., a Louisiana corporation headquartered in Lake Forest, Illinois, is a specialty generic pharmaceutical company that develops, manufactures, and markets generic and branded prescription pharmaceuticals and branded and private-label over-the-counter consumer and animal health products, specializing in alternative dosage forms. Akorn's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NASDAQ as "AKRX." Akorn files periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder. In 2003, Akorn was ordered to cease and desist from committing or causing any violations and any future violations of Section 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder. *Akorn, Inc.*, Exchange Act Release No. 48546 (Sept. 25, 2003).

9.      Timothy Dick was employed by Akorn from June 2009 until August 2015 and was Akorn's CFO during his entire tenure at the company. As CFO, Dick certified the material accuracy of Akorn's financial statements. Dick, 47 years old, is a resident of Hawthorn Woods, Illinois. Dick has never been licensed as an accountant.

10.     David Hebeda was employed by Akorn from May 2012 until August 2016 and was Akorn's Controller from May 2012 until May 2015. Hebeda, 50 years old, is a resident of Carol Stream, Illinois. Hebeda is an Illinois-registered certified public accountant.

## FACTS

### Background

11.     During the relevant period, Akorn's policies required it to recognize revenue and liabilities in accordance with GAAP.

12.     Akorn sold its products through multiple distribution channels. Among other things, Akorn sold its products to pharmaceutical wholesalers, which then resold the products to downstream retailers (such as pharmacies), and it also sold products directly to retailers. Akorn negotiated contractual prices with both wholesalers and retailers. These resulted in rebates and contractual allowances owed by Akorn to both wholesalers and retailers that needed to be recognized as reductions to revenue. *See* Accounting Standards Codification ("ASC") 605-50-45-2.

13.     Wholesaler chargebacks occur when a wholesale customer of Akorn sells to a retailer with a negotiated product price lower than the wholesale acquisition cost ("WAC"). The wholesaler then recovers the price difference from Akorn. A retailer billback occurs when a retailer has negotiated a price directly with Akorn but purchases goods from a wholesaler at a higher price. The retailer then bills Akorn for the price difference. The chart below depicts how both chargebacks and billbacks occur in a typical pharmaceutical sales transaction involving a wholesaler, compared to a hypothetical direct sale to a retailer.



14.     Akorn estimated and accrued amounts to cover chargebacks and billbacks. This process is commonly referred to in the pharmaceutical industry as "gross-to-net" accounting, and involves recording the gross revenue from product sales and establishing accruals for anticipated future chargebacks, billbacks and other forms of rebates associated with those sales. Akorn estimated its wholesaler chargeback liability at period-end based on the amount of inventory held by its wholesalers and historical experience with regard to how much of that inventory was typically sold through to retailers at below-WAC prices. Akorn accrued for retailer billbacks at period-end based upon actual invoices received from retail customers and estimates derived from sales data during that period. Dick and Hebeda oversaw the gross-to-net accounting process and approved the relevant gross-to-net adjustments in connection with the financial close for each quarter.

15.     The financial close for each quarter was completed during the month after the end of each quarter. After the quarterly financial close was completed, Dick and Hebeda presented final quarterly financial results to Akorn's CEO, COO and others in management.

16.     Akorn's chargeback, billback, and other rebate liabilities increased significantly in 2014 due to a number of events. First, Akorn acquired Hi-Tech Pharmacal Co., Inc. ("Hi-Tech"), a publicly-traded specialty pharmaceutical company roughly equal in size to Akorn which developed, manufactured and marketed generic and branded prescription and over-the-counter drug products. This acquisition, along with others in 2014, significantly increased Akorn's retail business and the volume and amount of billbacks due to retailers and further complicated and strained Akorn's accounting processes and systems. Second, a number of Akorn's products experienced dramatic market-wide increases in WAC, which resulted in significant additional chargeback, billback and other rebate liabilities. Finally, Akorn's retail and wholesale customers formed "alliances," which resulted in changes to those customers' contractual prices and their entitlements to rebates and contractual allowances.

Akorn's Insufficient Internal Accounting Controls

17.     At all times relevant to this complaint, Dick, as CFO, and Hebeda, as Controller, had supervisory responsibilities for – and control over – the policies related to and finance department staff involved in devising and maintaining a system of internal accounting controls at Akorn. Through their supervisory responsibilities and control, Dick and Hebeda had the power and ability to devise and maintain internal accounting controls sufficient to provide reasonable assurance, among other things, that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

18.     From 2013 to 2015, Akorn's management identified and publicly disclosed recurring material weaknesses in the company's ICFR. In relevant part, Akorn disclosed the following material weaknesses in its 2013 Form 10-K, filed on March 14, 2014, which related to its controls surrounding its gross-to-net reserve accounts:

> We did not have controls designed to validate the completeness
> and accuracy of underlying data used in the determination of
> significant estimates and accounting transactions. As a result,
> errors were identified in the underlying data used to support
> significant estimates and accounting transactions, primarily
> relating to gross to net revenue adjustments, inventory reserves and
> the determination of useful lives of acquired intangible assets.
>
> We did not have an adequate process in place to support the
> accurate and timely reporting of our financial results and
> disclosures in our Form 10-K.

Akorn had previously disclosed in its 2012 Form 10-K, filed on March 1, 2013, that it did not

maintain sufficient effective controls to provide reasonable assurance that accounts were

complete and accurate and agreed to detailed support.

19.     In response to these material weaknesses, on multiple occasions following the

release of Akorn's 2013 Form 10-K in March 2014, Akorn's Board of Directors and its CEO

emphasized to Dick and Hebeda the importance of enhancing Akorn's ICFR.

20.     In 2014, under the supervision of Dick and Hebeda, Akorn's finance department

attempted to design and implement enhanced controls by developing predominantly manual

procedures for calculating various rebate and contractual allowance reserves (the "Remediation

Plan"). These controls included verifying the completeness and accuracy of underlying data

pulled from multiple systems, documenting instructions for journal entries, and preparing gross-

to-net narrative documentation and flow charts. The Audit Committee signed off on the general

framework for the Remediation Plan. Dick and Hebeda supervised the design and

implementation of the Remediation Plan as a whole. Implementation of the Remediation Plan

and the performance of individual enhanced control procedures also involved other members of

the finance department supervised by Dick and Hebeda.

21.     The new procedures contemplated by the Remediation Plan did not sufficiently

improve Akorn's control processes by the end of 2014. During the year-end audit, Akorn's

outside auditors observed that controls were not designed to validate the completeness and accuracy of underlying data and continued to find errors in the calculation of various rebate and contractual allowance reserves, without any compensating controls that would mitigate the severity of the errors.

22. The challenges of designing and implementing enhanced controls were compounded by Akorn's efforts to integrate the accounting for the sales of Hi-Tech's products into Akorn's accounting platform. Certain finance department employees, who were also responsible for implementing the Remediation Plan and performing enhanced control procedures, were tasked by Dick and Hebeda with planning and implementing the integration of the Hi-Tech products. Akorn missed two internally-set deadlines to fully integrate Hi-Tech, but ultimately elected to partially transfer a subset of Hi-Tech's products onto Akorn's accounting platform in mid-November 2014. The transfer of a subset of Hi-Tech products onto Akorn's accounting platform in the middle of the fourth quarter of 2014 increased the risks associated with Akorn's process for calculating its various rebate and other contractual allowance reserve accounts.

23. Although Akorn hired new internal audit and finance department employees (including a Director of Financial Reporting) in 2014, Akorn did not increase the size, scope, and skills of its finance department in a manner that was sufficient to address the significant changes to Akorn's business and accounting processes discussed in paragraphs 16. and 22. above. During 2014, Akorn also did not seek to employ outside consultants with experience advising companies on improving ICFR systems and processes.

24. In 2014, Dick and Hebeda oversaw Akorn finance department personnel involved in devising and maintaining a system of internal accounting controls. In that time period,

Akorn's system of internal accounting controls was not sufficient to provide reasonable assurance, among other things, that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP. Akorn's insufficient internal accounting controls contributed to Akorn's materially inaccurate 2014 financial statements.

<u>Akorn's Materially Inaccurate 2014 Financial Statements and Restatement</u>

25.     At all times relevant to this complaint, Dick, as CFO, and Hebeda, as Controller, had supervisory responsibilities for – and control over – the policies related to and finance department staff involved in the making and keeping of books and records at Akorn that accurately reflected in reasonable detail the transactions and disposition of assets of Akorn.

26.     During the evening of April 9, 2015, while reviewing Akorn's first quarter financial statements for 2015, Akorn management discovered that the rebate reserve for the first quarter of 2015 was significantly understated. Subsequent to April 9, 2015, Akorn management reviewed the financial results for 2014 and found additional errors. As a result, on April 24, 2015, Akorn filed a Form 8-K with the Commission announcing that Akorn's Audit Committee, upon the recommendation of management, had concluded that the previously-issued financial statements for the year ended December 31, 2014 (originally filed on March 17, 2015), and the previously issued unaudited financial statements for the quarters ended June 30, 2014 and September 30, 2014 (originally filed on August 11, 2014 and November 10, 2014, respectively), should not be relied upon because of errors in the financial statements in those associated periods.

27.     On May 10, 2016, Akorn completed its 2014 financial statement restatement which identified material accounting errors primarily associated with rebates and contractual allowances for 2014. Net revenue for 2014 as previously reported of $593 million was overstated

by $38 million and was restated to be $555 million. Income from continuing operations before income taxes for 2014 as previously reported of $59 million was overstated by $34 million and was restated to be $25 million. Akorn's 2016 restatement generally disclosed three types of errors: failure to accrue for embedded retailer billbacks, underaccrual for certain revenue deductions, and the incorrect recognition of $2.9 million in revenue for a portion of a transaction with one of its wholesale customers. Dick and Hebeda oversaw Akorn finance department personnel involved in the making and keeping of books and records that did not accurately reflect in reasonable detail the transactions described below.

*Failure to Accrue for Embedded Retailer Billbacks*

28.     Akorn understated a portion of its rebate reserve estimate related to inventory in the wholesale channel that was ultimately sold to retailers and subject to billbacks, also known as embedded billbacks.

29.     This understatement occurred because Akorn did not identify all gross-to-net adjustments resulting from the growth and changes in its business, including those that would be payable to retail customers. Akorn accrued for billbacks using a combination of invoices received from retailers and estimates based on sales data where invoices had not been received. Historically, Akorn's products were not typically sold through the wholesale channel to retailers. However, this changed in 2014 when the Hi-Tech acquisition and alliances formed between several large wholesalers and certain retail customers resulted in increased Akorn sales through the wholesale channel to retailers, which significantly increased the amount of billbacks. Further, significant price increases on certain Akorn products, particularly the former Hi-Tech product Clobetasol, markedly increased the dollar amount of retailer billbacks relating to sales in the third and fourth quarter of 2014.

30.     This error was the single largest component of the 2016 restatement, resulting in a reduction of net revenue of $1.4 million in the three month period ended June 30, 2014, $8.1 million and $9.5 million in the three and nine month periods ended September 30, 2014, respectively, and $1.0 million and $10.5 million in the three and twelve month periods ended December 31, 2014, respectively.

*Underaccrual for Certain Revenue Deductions*

31.     Akorn identified at least nine errors in its estimates related to certain revenue deductions, namely rebates, billbacks, failure to supply, price protection penalties and other contractual adjustments. The information necessary to record the reserves for these items was generally known or estimable as of Akorn's financial statement dates. For example, Akorn did not accrue approximately $3 million of billbacks – relating to October and November 2014 sales to one of its larger retail customers ("Retailer A") – in the fourth quarter of 2014, even though Akorn received the relevant billback invoices from Retailer A on or around November 25, 2014.

32.     These errors occurred because of deficiencies in Akorn's system of identifying and/or estimating revenue deductions to accrue at period-end, including flaws in the completeness and accuracy of data used to calculate accruals, exacerbated by the partial integration of Hi-Tech in the fourth quarter of 2014, and an overreliance on a manual process stretched thin because of resource challenges. These deficiencies were compounded by communication failures across Akorn's contracts, business development, accounts receivable and accounting groups.

33.     These errors resulted in a reduction of net revenue of $1.7 million in the three month period ended June 30, 2014, $2.9 million and $4.6 million in the three and nine month

periods ended September 30, 2014, respectively, and $16.5 million and $21.0 million in the three and twelve month periods ended December 31, 2014, respectively.

*Errors in Properly Recognizing Revenue*

34.     Akorn recognized $2.9 million of revenue for a portion of a transaction with one of its wholesaler customers ("Wholesaler A") even though such revenue was not realized or realizable in accordance with ASC 605-10-25-1 – "Revenue Recognition."[1]

35.     In July 2014, Akorn announced a substantial price increase for Clobetasol – a legacy Hi-Tech product – that would become effective in August 2014. Historically, when Akorn announced price increases, it would cancel customers' existing purchase orders and reissue them at the new, increased price. However, in this case, Akorn shipped product to Wholesaler A pursuant to purchase orders in place before the increase in price went into effect.

36.     In September 2014, Akorn discovered this mistake, determined that it would "rebill" Wholesaler A for the difference between the old and new price – approximately $2.9 million – and subsequently accrued for the price increase on its books. However, Wholesaler A informed Akorn management that it was denying Akorn's attempt to rebill it for the $2.9 million because its purchase orders were issued before the date when the price increase went into effect. In response, Akorn recorded a reserve against the revenue associated with the price increase for the invoiced Clobetasol product, such that the $2.9 million was not recognized during the third quarter of 2014.

37.     After the third quarter of 2014, Akorn personnel in its sales and contracts groups continued to pursue an agreement with Wholesaler A whereby it would acknowledge Akorn's

---

[1]     Consistent with GAAP, Akorn's revenue recognition policy noted that revenue is recognized when certain criteria are met, including the seller's price to the buyer is fixed or determinable and collectibility is reasonably assured. As detailed in paragraphs 35-39, the price of the goods delivered was the disputed issue underlying the $2.9 million recognized, and Akorn did not have a basis to believe collectibility of the higher price was reasonably assured at the time it recognized the incremental revenue.

billing error and pay the higher price for the relevant Clobetasol sales. In connection with these efforts, in late October 2014, Akorn's then Senior Vice President National Accounts & Trade Relations forwarded an email to Akorn's senior management from Wholesaler A that indicated Wholesaler A would pay the higher Clobetasol price if its purchasing division agreed that the product was indeed billed in error and the parties reached agreement on an unrelated contractual allowance in dispute. Akorn management did not follow-up with Wholesaler A about the status of the two contingent issues introduced in this communication. Nonetheless, Akorn booked the $2.9 million in revenue in the fourth quarter of 2014.

38.     Akorn did not obtain any written or verbal acknowledgment from Wholesaler A that it would pay the $2.9 million before booking such amount in the fourth quarter of 2014. Instead, Akorn inappropriately relied on the email from Wholesaler A which conditioned Wholesaler A's payment of the higher Clobetasol price on further review by its purchasing division and on resolution of a separate disputed item.

39.     Wholesaler A did not pay the $2.9 million in late 2014 or early 2015. In or around May 2015, Wholesaler A's CEO told Akorn's CEO that Wholesaler A would not pay the higher Clobetasol price, reiterating its prior position that Wholesaler A's Clobetasol purchase orders were issued before the Clobetasol price increase went into effect. As a result, Akorn reversed the $2.9 million in revenue as part of its 2014 restatement.

13

## COUNT I

### VIOLATIONS OF SECTION 13(a) OF THE EXCHANGE ACT AND RULES 12b-20, 13a-1, 13a-11, AND 13a-13 THEREUNDER [15 U.S.C. § 78m(a) & 17 CFR § 240.12b-20, 13a-1, 13a-11, 13a-13]
### (Against Defendant Akorn)

40.     Paragraphs 1 through 39 are realleged and incorporated herein by reference.

41.     By its conduct Defendant Akorn failed to file, in accordance with such rules and regulations as the Commission prescribes as necessary or appropriate, such information and documents as the Commission requires to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to Section 12 of the Exchange Act, or such annual, quarterly, or other reports as the Commission prescribes, or failed to include, in addition to the information expressly required to be included in any statement or report filed pursuant to Section 13(a) of the Exchange Act such further material information, if any, as may have been necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

42.     By reason of the foregoing, Defendant Akorn violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 CFR § 240.12b-20, 13a-1, 13a-11, 13a-13].

## COUNT II

### VIOLATIONS OF SECTION 13(b)(2)(A) OF THE EXCHANGE ACT [15 U.S.C. § 78m(b)(2)(A)]
### (Against Defendant Akorn)

43.     Paragraphs 1 through 39 are realleged and incorporated herein by reference.

44.     By its conduct, Defendant Akorn failed to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected Akorn's transactions and disposition of assets.

45.     By reason of the foregoing, Defendant Akorn violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## COUNT III

### VIOLATIONS OF SECTION 13(b)(2)(B) OF THE EXCHANGE ACT [15 U.S.C. § 78m(b)(2)(B)]
### (Against Defendant Akorn)

46.     Paragraphs 1 through 39 are realleged and incorporated herein by reference.

47.     By its conduct, Defendant Akorn failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that: transactions were executed in accordance with management's general and specific authorization; transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles or any other criteria applicable to such statements, and to maintain accountability for assets; access to assets were permitted only in accordance with management's general or specific authorization; and the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

48.     By reason of the foregoing, Defendant Akorn violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## COUNT IV

### CONTROL PERSON LIABILITY [15 U.S.C. § 78t(a)]
### (Against Defendants Dick and Hebeda)

49.     Paragraphs 1 through 39 are realleged and incorporated herein by reference.

50.     As described above, Defendant Akorn violated Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

51.     Through their positions and responsibilities, Defendants Dick and Hebeda exercised general control over the operations of Akorn.

52.     Through their positions and responsibilities, Defendants Dick and Hebeda possessed the power or ability to control the specific transactions and activities upon which Akorn's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder are based, whether or not that power was exercised.

53.     By reason of the foregoing, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Dick is jointly and severally liable with, and to the same extent as, Akorn for its violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

54.     By reason of the foregoing, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Hebeda is jointly and severally liable with, and to the same extent as, Akorn for its violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

**RELIEF REQUESTED**

**WHEREFORE,** the Commission respectfully requests that this Court:

**I.**

Find that Defendants committed the violations alleged herein.

**II.**

Issue orders of permanent injunction restraining and enjoining Defendant Akorn, its agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15

U.S.C. § 78m(a), (b)(2)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 CFR § 240.12b-20, 13a-1, 13a-11, 13a-13].

## III.

Issue orders of permanent injunction restraining and enjoining Defendants Dick and Hebeda, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, from controlling any person liable for violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(a), (b)(2)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 CFR § 240.12b-20, 13a-1, 13a-11, 13a-13].

## IV.

Issue an Order imposing appropriate civil penalties upon Defendants Dick and Hebeda pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such orders for further relief the Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, the Commission demands that this case be tried before a jury.

Respectfully Submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Dated: March 26, 2018

s/ Michael J. Mueller
Michael J. Mueller (IL #6297254)
Attorney for Plaintiff
U.S. Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
T. (312) 353-7390
F. (312) 353-7398
MuellerM@sec.gov